UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TYRONE ADDISON EAGLESPEAKER<br><br>                    Petitioner,<br><br>     v.<br><br>DANA CONNELL and CHERYL STRANGE,<br><br>                    Respondents. | CASE NO. C22-5151-MJP-SKV<br><br>REPORT AND RECOMMENDATION |

## I. INTRODUCTION

Petitioner Tyrone Addison Eaglespeaker has filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 seeking relief from a Skamania County Superior Court judgment and sentence. Dkt. 10. Respondents have filed an answer responding to Petitioner's claims and have submitted relevant portions of the state court record. Dkts. 19–20-1. Petitioner has not filed a response to Respondents' answer. This Court, having carefully reviewed Petitioner's petition for writ of habeas corpus, Respondents' answer, and the balance of the record, concludes that the petition should be denied and this action should be dismissed with prejudice.

## II. FACTUAL BACKGROUND

The Washington Court of Appeals, on direct appeal, summarized the facts underlying

Petitioner's convictions as follows:

> On December 21, 2012, at approximately 11:30 A.M., J.R. called 911 and stated that a few days previously, Eaglespeaker, her friend's boyfriend, had sexually assaulted her. Deputy Christian Lyle responded, and J.R. told him that Eaglespeaker entered her house without permission and attempted to have sex with her. J.R. knew Eaglespeaker because he was dating her friend Nicole Nash. J.R. showed Lyle some clothing that she said belonged to Eaglespeaker as well as a credit card in his name. Lyle photographed a series of text messages sent to J.R.'s phone over the past two days that she attributed to Eaglespeaker.

> Detective Tim Garrity arrived a short time later and took a recorded statement from J.R. Ruanna Johnson then arrived to help J.R. with her children. Johnson told Garrity that she was the caretaker for Nash's residence and that Eaglespeaker was staying there while Nash was out of town. While the officers were investigating J.R.'s 911 call, dispatch received a hang-up 911 call from Nash's home.

> Johnson eventually let Deputy Gary Manning and Sergeant Jay Johnston into Nash's home after they knocked and nobody responded. Dispatch had already advised Manning that the 911 call he was investigating could be related to the call that Lyle was handling. Manning and Johnston began doing a protective sweep for anyone present. When Eaglespeaker emerged from a bedroom, Manning handcuffed him for officer safety and asked if he had tried to call 911. Eaglespeaker admitted that he had after hearing someone say "he had done something to someone."

> Garrity and Lyle arrived, and Manning told Eaglespeaker that Garrity would want to talk to him about another incident. After telling Garrity that he had heard J.R. made up a story about him, Eaglespeaker said, "[M]y father has an attorney," and "maybe I should call my dad." Manning read Eaglespeaker his *Miranda* rights, and Eaglespeaker said he wanted to speak to the officers.

> Eaglespeaker admitted that he frequently went over to J.R.'s home but added that he always knocked before entering. He said that she had asked him to shower with her a few days ago but that he had declined. He denied having sexual relations with her. Garrity asked Eaglespeaker for his phone knowing that a cell phone and text messages were involved. Eaglespeaker directed him to the bedroom, where Garrity found drugs and drug paraphernalia. Garrity arrested Eaglespeaker and Lyle took him to jail.

> On the evening of December 23, Eaglespeaker asked to speak to a deputy. Eaglespeaker told the responding deputy, Mike Hepner, that he wanted to work off

his charges.  When Hepner replied that he did not know why Eaglespeaker was in jail, Eaglespeaker responded "rape," and Hepner said he would pass it on to a detective.  Eaglespeaker then added, without prompting from Hepner,

> I did not rape her, she answered the door naked and wanted to have sex.  I told her no because I have a girlfriend but agreed to finger bang her.  I finger banged her for quite a while and then I went home and decided I wanted to have sex because she is so hot.  I went back the next day and she again answered the door naked.  I asked for sex and she said no but we can take a shower together.  I did not want to take a shower I wanted to have sex so I said no and left.

The State charged Eaglespeaker by amended information with rape in the first degree, burglary in the first degree, unlawful possession of a controlled substance, and use of drug paraphernalia.  The trial court held a CrR 3.5 hearing to determine the admissibility of Eaglespeaker's pretrial statements.  At its close, the defense did not object to the admission of the statements that Eaglespeaker made at the time of his arrest, but the defense did seek suppression of his jail statements because law enforcement did not readvise Eaglespeaker of his *Miranda* rights before he made them. The trial court entered written findings of fact and conclusions of law to support its ruling that with one exception, Eaglespeaker's statements were admissible.

The State then moved to admit J.R.'s two-minute 911 call into evidence under ER 803(a)(2), the exited utterance exception to the hearsay rule.  After listening to part of the call, the trial court granted the State's motion, ruling that the passage of "a couple of days" did not affect the call's admissibility.

During trial, the law enforcement officers testified to the facts described above.  Over Eaglespeaker's objection, the trial court allowed Lyle to testify about J.R.'s initial statements to him under the excited utterance rule.  Lyle added that J.R. said she had left a window open on the night of the rape.  Lyle testified that her front door showed no signs of forced entry.

Johnson testified that after J.R. told her about the rape, she persuaded J.R. to call the police because of J.R.'s concern that Eaglespeaker would return.  Johnson added that while she was with J.R., Eaglespeaker called.   Johnson described the conversation:

> She put her phone speaker phone and she said, "What do you want Tyrone?" and then he's all, "Why you talkin' to me like that?" and then she said, "Why, you know why," and then he's all, "I didn't do nothin' that bad," and then she said, "You call ripping my pants off while I'm screaming no, not that bad?" and he's all, "No, that wasn't that bad."

Before J.R. testified, Eaglespeaker objected to the admission of the text messages J.R. had received. The defense argued that these messages were irrelevant because there was nothing to show that Eaglespeaker had sent them. J.R. had told officers that when she recovered the phone from Eaglespeaker, the text messages were erased. The trial court responded that J.R. would need to authenticate the texts.

The State then showed J.R. photographs of text messages from her cell phone that Lyle took on December 21, 2012. J.R. explained that Eaglespeaker had been using her boyfriend Scott's cell phone while Scott was incarcerated and while she was exchanging texts with that phone. J.R. added that the texts she received addressed events that were happening while Eaglespeaker had the phone and were "things that only he would know." The court admitted photographs of the texts from December 19 and 20.

The texts started with an exchange about Eaglespeaker helping J.R. sell her boyfriend's truck canopy. J.R. testified that her boyfriend then called from prison and that the two of them had a long argument, during which Eaglespeaker came to her house "a couple times" and left because of the ongoing argument. J.R. later texted Eaglespeaker that she felt "like throwing up" because she was so upset with her boyfriend. When Eaglespeaker did not respond, she sent another text asking why he was ignoring her. Eaglespeaker responded that he had just woken up and would "be over in a few." After some additional messages, J.R. texted Eaglespeaker that he could go back to sleep if he wanted. He responded, "I need to shower, [what about you?]" J.R. answered that she always waited until her children were asleep, to which Eaglespeaker replied, "Okay, well if you want me to come over then let me know." J.R. replied, "Sweet dreams." The messages continued:

[Eaglespeaker]: Yeah, don't let the meth bugs bite.

. . . .

[J.R.]: What's up with you. You're either really nice or really mean, confusing.

. . . .

[Eaglespeaker]: Really mean, but my album's incredible . . . . Are you ready to hump?

. . . .

[J.R.]: No, but at least now I know that's the only reason that you wanted to hang out, not surprising, happens a lot.

. . . .

[Eaglespeaker]:  Okay, you're such an ass.  You make me feel like an animal or is it cuz I'm an Indian.  Well call it what you want, that's what normal people do.  To me it seems there's no mutual attraction.  You brush me and push me away, tease me.  I'm man plus an addict, so you don't have to treat me like I'm being put through a test a time . . . .  Wish you felt like I did and not want me for the wrong reasons . . . .  I'm leaving your phone on your doorstep, I'm frustrated.

                    . . . .

[J.R.]:  Why does it have to revolve around sex?  You're being stupid right now.  You're totally tripping.  Who cares if you're an addict, who isn't? . . .  I didn't do anything to deserve this . . . .  Real mature, I didn't think you were that shallow . . . .

[Eaglespeaker]:  I'm not shallow.  I'm a man who has hung out with you for days and get no affection or attention hardly so naturally I feel like I'm just a reject . . . .  If I can't have it my way, I don't want it at all . . . .

                    . . . .

[J.R.]:  I'm speechless basically . . . .  You are being pretty shallow, shallow, shallow . . . .  Waste your time elsewhere if [you] want.  I[t] won't be my loss, that's for damn sure.

        Eaglespeaker then texted, "You up still?"  J.R. replied, "Yep, kids just fell asleep."  J.R. testified that she fell asleep at around 3:30 A.M. on December 20.  The next thing she knew, Eaglespeaker was standing in her bedroom.  J.R. denied giving him permission to enter her home but said that she might have left the back window or door unlocked.  She testified that Eaglespeaker forced himself on top of her and penetrated her vagina with his fingers.  He left at about 6:15 A.M.

        J.R. explained that she felt frightened but did not immediately call the police because she had used drugs recently and feared that Child Protective Services (CPS) might take her children.  J.R. had testified earlier that she had been granted a stay of prosecution stemming from recent drug and theft convictions.

        J.R. then testified that when Eaglespeaker came to her home four or five hours later to borrow her car, she let him in and let him use the car.  J.R. went over to a friend's house to tell her about the rape, but decided not to because Eaglespeaker's friend was there.  J.R. did tell Johnson by phone and in person about the rape, and she showed Johnson the texts from Eaglespeaker as well.  J.R. told Nash.  Nash and Johnson promised that they would make Eaglespeaker leave the area.

REPORT AND RECOMMENDATION - 5

On December 20, J.R. received another text from Eaglespeaker while he was using her car. The message said, "Okay, I just feel like I violated you, sorry, no drama. It's not easy to be on this elevator up and down, down, down." J.R. and Eaglespeaker exchanged several more texts that evening. After Eaglespeaker realized that Johnson was trying to make him leave Nash's residence, he called J.R. and told her that if she didn't tell Johnson she was lying, he would call CPS and Clark County Diversion. Johnson testified that she overheard that call.

That same evening, J.R. had a friend spend the night with her in case Eaglespeaker returned. She testified that she called the police on December 21 after Johnson told her that Eaglespeaker had not left Nash's home. After the State played her 911 call, J.R. explained that she initially reported that Eaglespeaker tried to rape her because she did not realize that digital penetration constituted rape. On cross-examination, she reiterated that she did not immediately call the police because she feared losing her children.

At the State's request, and over defense counsel's objection, the trial court instructed the jury on the uncharged inferior-degree offense of rape in the second degree. The jury acquitted Eaglespeaker of rape in the first degree and burglary in the first degree but found him guilty of rape in the second degree as well as the drug charges. The trial court sentenced Eaglespeaker to 119 months in prison and imposed $6,150 in LFOs. Eaglespeaker appeals his rape conviction as well as the discretionary LFOs imposed.

Dkt. 20-1 at 205–11 (footnotes and internal citations omitted).

## III. PROCEDURAL BACKGROUND

Following his conviction for rape in the second degree and drug charges, on June 13, 2013, Petitioner was sentenced to a total term of 210 months to life imprisonment. Dkt. 20-1 at 8, 17. Petitioner appealed to the Washington Court of Appeals. *See id.* at 69–126. On May 1, 2014, while his direct appeal was pending, Petitioner was resentenced to 119 months to life imprisonment. *Id.* at 27, 36.

### A.    Direct Appeal

Petitioner presented the following five issues to the court of appeals for review:

1.    The moving party is entitled to a jury instruction on an inferior degree offense when, looking at the evidence in the light most favorable to the moving party, affirmative evidence demonstrates a reasonable inference that only the inferior degree offense occurred. An inferior degree instruction is not supportable if it depends upon the jury simply disbelieving certain evidence. Did

the trial court err when it granted the State's request for a second degree rape instruction over Mr. Eaglespeaker's objection where no affirmative evidence showed forcible compulsion without felonious entry and the court and prosecutor recognized the jury could convict of second degree rape only if it disbelieved the State's evidence of felonious entry?

2.    Excited utterances are admissible, as a limited exception to the hearsay prohibition, if the statement relates to a startling event or condition and is made while the declarant remained continuously under the stress of excitement caused by the event or condition. The proponent of the statement bears the burden to prove admissibility. Did the trial court abuse its discretion, requiring reversal of the conviction, by admitting the alleged victim's out-of-court statements under the excited utterance exception where they were made to a 9-1-1 operator and then responding police officers a couple days after the alleged startling event, the State presented no evidence the declarant remained continuously under the stress of the event, and the evidence eventually adduced at trial shows she was not under continuous stress of the event such that she did not have the opportunity to fabricate?

3.    Under the federal constitution, police may not continue to question a suspect after he unequivocally invokes his right to counsel. The Court should interpret our state constitutional provision more broadly to hold that an equivocal invocation may be followed up only with clarifying questions regarding the equivocal invocation. Statements obtained in violation of these constitutional rules may not be admitted at trial. Did the trial court err in admitting Mr. Eaglespeaker's statements to police obtained after he requested an attorney, but was not provided one?

4.    Multiple errors may combine to deprive an accused person of a fundamentally fair trial, in violation of the due process clauses of the Washington and federal constitutions. In light of the cumulative effect of the hearsay statements and Mr. Eaglespeaker's statements to police, both of which were admitted erroneously, coupled with the improperly provided lesser offense instruction, was Mr. Eaglespeaker denied a fundamentally fair trial?

5.    The trial court is required to consider a defendant's financial circumstances and ability to pay before imposing discretionary costs. Did the trial court err by failing to do so here, requiring this Court to strike the discretionary costs?

Dkt. 20-1 at 80–82.

In a statement of additional grounds for review, Petitioner presented an additional issue— whether text messages admitted by the trial court were properly authenticated—to the court of appeals for review. *Id.* at 128–33.

On May 12, 2015, the court of appeals issued an unpublished opinion affirming Petitioner's judgement and sentence. *Id.* at 204–21.

Thereafter, Petitioner sought review by the Washington Supreme Court. *Id.* at 223–67. In his petition for review, Petitioner identified the following six issues:

>    1.    Does the Court of Appeals' opinion affirming the trial court's decision to offer an instruction on a lesser-degree offense conflict with *State v. Brown*, 127 Wn.2d 749, 754-56, 903 P.2d 459 (1995), warranting review?  RAP 13.4(b)(1).

>    2.    The Court of Appeals agreed that the complaining witness's out-of-court statements to a 911 operator and to a police officer were improperly admitted under the excited utterance exception to the hearsay rule.  Did the court err in concluding the error was harmless where the untainted evidence was equivocal and far from overwhelming?

>    3.    Did the trial court err and violate Mr. Eaglespeaker's constitutional rights by admitting his statements to police obtained after he requested an attorney, but was not provided one?

>    4.    Were photographs of text messages erroneously admitted at trial because they were not sufficiently authenticated?

>    5.    In light of the cumulative effect of the errors in admitting harmful evidence, coupled with the improperly provided lesser offense instruction, was Mr. Eaglespeaker denied a fundamentally fair trial?

>    6.    The trial court is required to consider a defendant's financial circumstances and ability to pay before imposing discretionary costs. Did the trial court err by failing to do so here?

Dkt. 20-1 at 228–29.

The Supreme Court denied Petitioner's petition for review without comment on November 4, 2015,  *id.* at 269, and the court of appeals issued a mandate terminating direct review to the trial court on November 13, 2015, *id.* at 271.

**B.    Personal Restraint Petitions**

On February 23, 2016, Petitioner filed a motion for relief from judgment in Skamania County Superior Court.  *See* Dkt. 20-1 at 274–92.  In doing so, Petitioner argued his conviction

should be vacated and a new trial ordered based on newly discovered evidence that (1) the victim

had previously falsified rape allegations in Oregon, and (2) an exculpatory witness had observed

Petitioner and the victim kissing hours before the rape. *See id.* at 459. He also argued that the

State violated its disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), when it

failed to disclose this newly discovered evidence to Petitioner. *Id.* at 459. Petitioner presented

the following issue to the superior court for review:

> 1.    A NEW TRIAL SHOULD BE GRANTED BECAUSE OF NEWLY
> DISCOVERED EVIDENCE, POTENTIAL BRADY VIOLATIONS, AND
> FUNDAMENTAL FAIRNESS OF THE PROCEEDINGS.

Dkt. 20-1 at 279.

On May 16, 2018, the superior court denied Petitioner's motion. *Id.* at 327–29. The

court made the following findings and transferred the motion to the court of appeals for

consideration as a personal restraint petition:

> 1.    The defendant has not made even a prima facie case that there was
> a *Brady* violation by the State with respect to any newly discovered evidence
> alleged in his motion for a new trial and a hearing to take evidence on this matter
> would be a fishing expedition.
>
> 2.    To the extent that anyone was aware, prior to the defendant's trial, of
> the newly discovered evidence alleged by the defendant, the prosecutor or the
> prosecution team were not aware of it, and the purported knowledge by either the
> Attorney General or DSHS can't be imputed to the prosecutor for the purposes of
> his *Brady* obligations.
>
> 3.    Regarding the alleged newly discovered information regarding the
> statements [the exculpatory witness] made to the Deputy Prosecutor after the trial,
> the substance of those statements demonstrate that they were not communicated to
> any law enforcement officer prior to the trial. Also, the substance of the statements
> suggests that the defendant would have been aware of the information if it was true,
> and could have communicated that to his attorney prior to the trial.
>
> 4.    With regard to the alleged newly discovered information related to
> prior alleged false allegations of rape, this evidence is "merely cumulative or
> impeaching" under the *State v. Williams* test and would not be substantive evidence
> in this case. The victim's credibility was already made an issue in the case when

she was questioned about providing prior false testimony under oath to an Oregon grand jury.

Dkt. 20-1 at 327–28.

On July 28, 2020, in an unpublished opinion, the court of appeals denied Petitioner's personal restraint petition, finding Petitioner was not entitled to a new trial because (1) certain of the newly discovered evidence was inadmissible hearsay; (2) the newly discovered admissible evidence was "merely cumulative or impeaching," could have been discovered by Petitioner prior to trial through the exercise of due diligence, and was not material; and (3) Petitioner had failed to show that the prosecutor violated *Brady* because there was no indication the prosecutor had any knowledge of the allegedly improperly suppressed evidence prior to trial, and Petitioner could have discovered the evidence himself through the exercise of due diligence. *See id.* at 459–76.

On August 25, 2020, Petitioner sought discretionary review by the Washington Supreme Court. *See id.* at 478–520. Petitioner presented the following issues to the Supreme Court for review:

> 1.    Division Two held the newly-discovered evidence that the complaining witness previously recanted identical allegations did not warrant a new trial because the evidence is "merely cumulative or impeaching." Whether the Court should grant review because the opinion below conflicts with this Court's decision in *State v. Gregory*, 158 Wn.2d 759, 798-800, 147 P.3d 1201 (2006), with other opinions from the Court of Appeals, including *State v. Roche*, 114 Wn. App. 424, 437-38, 59 P.3d 682 (2002) and *State v. Savaria*, 82 Wn. App. 832, 838, 919 P.2d 1263 (1996), and with federal law? RAP 13.4(b)(1), (2), (3); RAP 13.5A.
>
> 2.    Whether the Court should grant review of the substantial constitutional question whether, for *Brady* purposes, a state prosecuting agency's knowledge is imputed to the county prosecuting attorney's office where the agencies consulted with each other, exchanged records, jointly investigated, and were closely aligned? RAP 13.4(b)(3), (4); RAP 13.5A.
>
> 3.    The Court of Appeals opinion holds the government had no duty to disclose its interview with a third-party, exculpatory witness because Eaglespeaker saw the witness at some point on the night of the alleged crime. Whether the Court

should grant review where the holding conflicts with federal law that the government cannot presume the defendant remembers the witness, knows everything in the witness's head, and understands the witness's legal significance and where, factually, no evidence shows Eaglespeaker in fact saw the witness? RAP 13.4(b)(3); RAP 13.5A.

Dkt. 20-1 at 483–84.

On March 16, 2021, the Washington Supreme Court denied discretionary review, *id.* at 691, and on March 31, 2021, the court of appeals issued a certificate of finality certifying that its July 28, 2020, decision became final on March 16, 2021, *id.* at 693.

While the personal restraint petition was pending, on May 13, 2020, Petitioner filed a motion for resentencing in Skamania County Superior Court. *Id.* at 695–702. On July 6, 2020, the trial court transferred the motion to the court of appeals for consideration as a personal restraint petition. *Id.* at 704–06. Subsequently, Petitioner moved to voluntarily withdraw this petition, *id.* at 710–12, and on September 10, 2020, the court of appeals dismissed it, *id.* at 708. On October 29, 2020, the court of appeals issued a certificate of finality certifying that its September 10, 2020, decision became final on October 12, 2020. *Id.* at 714.

On May 7, 2021, the trial court resentenced Petitioner to 110 months to life in prison. *Id.* at 721, 729.

Petitioner now seeks federal habeas review of his judgment and sentence. Dkt. 10.

### IV. GROUNDS FOR RELIEF

Petitioner presents six claims for federal habeas relief in his petition:

1.    Post-conviction counsel provided [i]neffective [a]ssistance of [c]ounsel by failing to discover the [i]neffective [a]ssistance of [t]rial counsel and raise the argument in a timely manner, and counsel was ineffective for failing to timely apply the confrontation clause of the Sixth Amendment into the opening brief on collateral review . . . .

2.    Trial counsel provided [i]neffective [a]ssistance of [c]ounsel by failing to discover exculpatory evidence in his possession before trial, and trial

counsel was ineffective for failing to interview an exculpatory witness before trial
. . . .

       3.     The government violated Brady because the government failed to disclose the complaining witness' prior, false, recanted, and strikingly similar allegations of rape . . . .

       4.     The government violated Brady by failing to turn over exculpatory evidence from a third-party witness Russel Helm.

       5.     The court of [a]ppeals erred when they held that the newly presented evidence is 'merely cumulative or impeaching' and this holding conflicts with federal decisions.

       6.     The court of appeals erred when they held that the new evidence presented constituted inadmissible hearsay and this holding conflicts with federal decisions.

Dkt. 10 at 1–2.

## V. DISCUSSION

Respondents argue that certain of Petitioner's claims—specifically, his first and second claims—are not properly before this Court because Petitioner failed to exhaust them in state court. Dkt. 19 at 10, 12–14. Respondents further argue that because both claims are now time barred, the Court is procedurally barred from considering them. *Id.* at 13–14. Respondents concede that Petitioner's third and fourth claims were properly exhausted and are therefore eligible for review. *Id.* at 10. However, they argue that Petitioner is not entitled to relief with respect to either claim. *Id.* at 29–37. Respondents do not address Petitioner's fifth and sixth claims in their answer.

### A.    Exhaustion and Procedural Default

The Court begins by addressing Respondents' argument that Petitioner's first and second claims for ineffective assistance of post-conviction and trial counsel are procedurally barred because they were not properly exhausted in state court and are now time barred. The Court

further addresses whether Petitioner is procedurally barred from asserting his fifth and sixth claims for relief on failure to exhaust grounds.[1]

1.    Legal Standard

A state prisoner is required to exhaust all available state court remedies before seeking a federal writ of habeas corpus.  28 U.S.C. § 2254(b)(1).  The exhaustion requirement is a matter of comity, intended to "give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal quotation marks and citations omitted).  In order to provide the state courts with the requisite "opportunity" to consider a prisoner's federal claims, the prisoner must "fairly present" his claims to each appropriate state court for review, including a state supreme court with powers of discretionary review.  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995), and *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).

"In order to 'fairly present' an issue to a state court, a petitioner must 'present the substance of his claim to the state courts, including a reference to a federal constitutional guarantee and a statement of facts that entitle the petitioner to relief.'"  *Gulbrandson v. Ryan*, 738 F.3d 976, 992 (9th Cir. 2013) (quoting *Scott v. Schriro*, 567 F.3d 573, 582 (9th Cir. 2009)).  *See also Picard*, 404 U.S. at 275–78 (proper exhaustion requires a petitioner to have "fairly presented" to the state courts the exact federal claim he raises on habeas by describing the operative facts and federal legal theory on which the claim is based)  It is not enough that all of the facts necessary to support a prisoner's federal claim were before the state courts or that a somewhat similar state law claim was made.  *Anderson v. Harless*, 459 U.S. 4, 6 (1982).  "If a

---

[1] The Court "may consider whether state remedies have been exhausted even if the state does not raise the issue."  *Campbell v. Crist*, 647 F.2d 956, 957 (9th Cir. 1981).

1    petitioner fails to alert the state court to the fact that he is raising a federal constitutional claim,

2    his federal claim is unexhausted regardless of its similarity to the issues raised in state court."

3    *Johnson v. Zenon*, 88 F.3d 828, 830 (9th Cir. 1996).  Claims that are based on the same facts

4    must be separately exhausted if they are supported by distinct constitutional theories.  *See Gray*

5    *v. Netherland*, 518 U.S. 152, 162–63 (1996).

6          A prisoner procedurally defaults on a federal habeas claim when he fails to exhaust his

7    state court remedies with respect to the claim and the court to which the prisoner would be

8    required to present his claim in order to satisfy the exhaustion requirement would now find the

9    claim to be procedurally barred.  *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).  When a

10   prisoner defaults on his federal claims in state court, federal habeas review of the claims is

11   barred unless the prisoner can demonstrate "cause" for the default and "actual prejudice" as a

12   result of the alleged violation of federal law, or demonstrate that failure to consider the claims

13   will result in a fundamental miscarriage of justice because he is actually innocent.  *Id.* at 750;

14   *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

15                    2.    Petitioner's Failure to Exhaust

16         In his first ground for relief, Petitioner asserts that his trial counsel provided ineffective

17   assistance of counsel by (1) failing to discover evidence of the victim's prior false rape allegation

18   that was in counsel's possession before trial, and (2) failing to interview an alleged exculpatory

19   witness, Mr. Russel Helm.  Dkt. 10 at 11–14.  In his second ground for relief, Petitioner asserts

20   that his post-conviction counsel provided ineffective assistance of counsel by (1) failing to

21   investigate and timely raise trial counsel's ineffectiveness in Petitioner's post-conviction

22   proceedings, (2) failing to raise arguments pertaining to the Sixth Amendment's Confrontation

23   Clause in the opening brief on collateral review, and (3) failing to argue that the victim had a

24   motive to lie.  *Id.* at 4–8.  Respondents argue that Petitioner has failed to exhaust both grounds

1    for relief because he did not attempt to raise either in the state courts, Dkt. 19 at 13–14, and

2    Petitioner seemingly concedes as much, Dkt. 10 at 8–10, 15.  Respondents further argue that

3    because more than one year has passed since Petitioner's judgment became final, he is now

4    procedurally barred from pursuing either claim under RCW 10.73.090(1).  Dkt. 19 at 13–14.

5          In his fifth ground for relief, Petitioner asserts that the Court should grant relief because

6    the court of appeals' holding that the newly discovered evidence was "merely cumulative or

7    impeaching" conflicts with *Brady, Giglio v. United States*, 405 U.S. 150, 154–55 (1972)

8    (reversing for a new trial where evidence relating to the credibility of a key witness was

9    suppressed), and related case law.  Dkt. 10 at 25–26.  In his sixth ground for relief, Petitioner

10    argues that the court of appeals improperly held that the newly discovered evidence was

11    inadmissible hearsay and that "the prior false rape allegations are constitutionally required under

12    the Confrontation Clause . . . ." *Id.* at 27.

13          This Court's review of the relevant state court record, Dkt. 20-1 at 69–269, 274–691,

14    695–712, confirms that Petitioner did not raise ineffective assistance of trial or post-conviction

15    counsel claims on direct appeal to the Washington Court of Appeals or the Washington Supreme

16    Court, nor did he raise such claims in his subsequent personal restraint petitions.  Petitioner

17    likewise did not challenge the Washington Court of Appeals' finding that the newly discovered

18    evidence constituted inadmissible hearsay to the court of appeals or to the Washington Supreme

19    Court on discretionary review.[2]  And while it is unclear whether Petitioner intends to separately

20

21          [2] In his motion for discretionary review, Petitioner did argue in footnote that "investigative reports and out-of-court statements"—like those at issue here—are not hearsay when used for

22    impeachment purposes.  Dkt. 20-1 at 489 n.7 (citing *State v. Roche*, 114 Wn. App. 444 (2002)).  Even assuming this was sufficient to satisfy the exhaustion requirement, whether the newly discovered

23    evidence constituted inadmissible hearsay raises a discretionary state law issue that is not cognizable in habeas.  *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (it is not the province of federal habeas courts to re-examine state court conclusions regarding matters of state law); *Lewis v. Jeffers*, 497 U.S. 764, 780

24    (1990) ("federal habeas corpus relief does not lie for errors of state law").

1    raise a Confrontation Clause claim in these proceedings, he did not adequately allege that

2    precluding him from questioning the victim about her prior false rape allegation violated the

3    Confrontation Clause in state court.[3]  However, in his first personal restraint petition and in his

4    motion for discretionary review to the Washington Supreme Court, Petitioner did argue that the

5    newly discovered evidence was not "merely cumulative or impeaching," as it satisfied the *Brady*

6    standard for materiality.  Dkt. 20-1 at 280, 485–89.  Given this, Petitioner's first, second, and

7    sixth grounds for relief have not been properly exhausted, whereas his fifth ground for relief has.

8         RCW 10.73.090(1) bars a defendant from filing a personal restraint petition or other

9    collateral challenge to a judgment and sentence in a criminal case more than one year after the

10   judgment and sentence become final.  Petitioner's judgment and sentence became final for the

11   purposes of state law on November 13, 2015, Dkt. 20-1 at 271, the date the court of appeals

12   issued its mandate terminating direct review of Petitioner's appeal, *see* RCW 10.73.090(3)(b).  It

13   therefore seems clear that Petitioner would now be time barred from returning to the state courts

14   to present his unexhausted claims,[4] and that he has procedurally defaulted on those claims for the

15   purposes of federal habeas review, *Coleman*, 501 U.S. at 735 n.1.  Thus, federal review of his

16

17        [3] While Petitioner did arguably raise a Confrontation Clause argument to the court of appeals on
     reply in the first personal restraint proceeding, Dkt. 20-1 at 363–67, he did not raise the same argument to

18   the Washington Supreme Court in his motion for discretionary review.  Petitioner's motion for
     discretionary review string cites to *Baker v. McNeil*, 711 F. Supp. 2d 1313, 1316 (N.D. Fla. 2010) and

19   *White v. Coplan*, 399 F.3d 18, 24–25 (1st Cir. 2005), both of which held that prohibiting a defendant from
     cross-examining a witness about the witness's prior recantation of similar allegations violates the

20   Confrontation Clause.  However, Petitioner did not allege a Confrontation Clause violation in his motion,
     nor did he seemingly cite either case primarily for that proposition.  Instead, Petitioner argued only that

21   the court of appeals erred when finding that the newly discovered evidence was "merely cumulative or
     impeaching" because doing so deprived the jury of evidence relating to the victim's credibility.  Dkt. 20-1

22   at 485–89.  This was insufficient to "alert the state court to the fact that he [was] raising a federal
     constitutional claim," *Johnson*, 88 F.3d at 830, based on the Confrontation Clause.

23        [4] Even if Petitioner's second amended judgment and sentence, Dkt. 20-1 at 716–31, which became
     final on May 7, 2021, *id.* at 716, were used to analyze the state time bar, *see* RCW 10.73.090(3)(a), more

24   than a year has passed since that time, meaning any collateral challenge by Petitioner would still be time
     barred.

1    ineffective assistance of counsel, inadmissible hearsay, and Confrontation Clause claims is

2    barred absent a showing of cause and prejudice.

3                3.      Cause and Prejudice

4        As indicated, when a state prisoner defaults on his federal claims in state court, federal

5    habeas review of the claims is barred unless the prisoner can demonstrate "cause" and

6    "prejudice," or demonstrate that failure to consider the claims will result in a fundamental

7    miscarriage of justice because he is actually innocent. *Coleman*, 501 U.S. at 750; *Murray*, 477

8    U.S. at 496. To satisfy the "cause" prong of this standard, a petitioner must show that some

9    objective factor external to the defense prevented him from complying with the state's

10   procedural rule. *Coleman*, 501 U.S. at 753 (citing *Murray*, 477 U.S. at 488). "Cause" is not

11   demonstrated if the default is fairly attributable to the petitioner's own conduct. *McCoy v.*

12   *Newsom*, 953 F.2d 1252, 1258 (11th Cir. 1992). "The fact that [a petitioner] did not present an

13   available claim or that he chose to pursue other claims does not establish cause."

14   *Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1306 (9th Cir. 1996).

15       To show "prejudice," a petitioner "must shoulder the burden of showing, not merely that

16   the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and

17   substantial disadvantage, infecting his entire trial with error of constitutional dimensions."

18   *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). Only in an

19   "extraordinary case" may the habeas court grant the writ without a showing of "cause" or

20   "prejudice" to correct a "fundamental miscarriage of justice" where a constitutional violation has

21   resulted in the conviction of a defendant who is actually innocent. *Murray*, 477 U.S. at 496.

22       Petitioner does not argue that he can overcome his procedural default by demonstrating

23   that the failure to consider his claims will result in a fundamental miscarriage of justice or that he

24

1    is actually innocent.  The Court, as such, only considers whether Petitioner establishes "cause"

2    and "prejudice" excusing his procedural default.

3               a.        *Claim 1: Ineffective Assistance of Post-Conviction Counsel*

4          The Court need not analyze whether Petitioner has established "cause" or "prejudice" to

5    excuse the procedural default of his ineffective assistance of post-conviction counsel claim

6    because such a claim necessarily fails.  There is no constitutional right to an attorney in state

7    post-conviction proceedings.  *Coleman*, 501 U.S. at 752–53; *Pennsylvania v. Finley*, 481 U.S.

8    551, 555 (1987); *Murray v. Giarratano*, 492 U.S. 1 (1989) (applying the rule to capital cases).

9    Consequently, Petitioner cannot claim constitutionally ineffective assistance of counsel in his

10   post-conviction proceedings.  *Coleman*, 501 at 752–53; *Wainwright v. Torna*, 455 U.S. 586,

11   587–88 (1982) (where there is no constitutional right to counsel there can be no deprivation of

12   effective assistance).  Petitioner's claim for ineffective assistance of post-conviction counsel

13   should be dismissed.

14              b.        *Claim 2: Ineffective Assistance of Trial Counsel*

15         Petitioner argues that the ineffective assistance of his post-conviction counsel serves as

16   "cause" excusing the procedural default of his ineffective assistance of trial counsel claim.  Dkt.

17   10 at 6, 8–10.

18         As indicated, there is no federal constitutional right to effective assistance of counsel

19   during state post-conviction proceedings, meaning an attorney's ignorance or inadvertence in a

20   post-conviction proceeding does not establish "cause" excusing procedural default.  *Davila v.*

21   *Davis*, 137 S. Ct. 2058, 2065 (2017); *Coleman*, 501 U.S. at 752–53.  However, in *Martinez v.*

22   *Ryan*, 566 U.S. 1, 14 (2012), the United States Supreme Court announced a limited qualification

23   to this rule, which provides that the absence of counsel or the inadequate assistance of counsel in

24

1    an initial-review collateral proceeding may establish "cause" for a claim of ineffective assistance

2    of counsel at trial.

3          To establish "cause" under *Martinez*, the petitioner must show that "(1) the underlying

4    ineffective assistance of trial counsel claim is 'substantial'; (2) the petitioner was not represented

5    or had ineffective counsel during the [post-conviction relief ('PCR')] proceeding; (3) the state

6    PCR proceeding was the initial review proceeding; and (4) state law required (or forced as a

7    practical matter) the petitioner to bring the claim in the initial review collateral

8    proceeding." *Dickens v. Ryan*, 740 F.3d 1302, 1319 (9th Cir. 2014) (en banc) (citing *Trevino v.*

9    *Thaler*, 569 U.S. 413, 422 (2013)).

10         To satisfy the first prong of *Martinez*, "a prisoner must . . . demonstrate that the

11   underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that

12   the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14. "An

13   [ineffective assistance of counsel] claim has merit where (1) counsel's 'performance was

14   unreasonable under prevailing professional standards,' and (2) 'there is a reasonable probability

15   that but for counsel's unprofessional errors, the result would have been different.'" *Cook v.*

16   *Ryan*, 688 F.3d 598, 610 (9th Cir. 2012) (internal citation omitted). "Substantiality" requires a

17   petitioner to demonstrate that "reasonable jurists could debate whether . . . the petition should

18   have been resolved in a different manner or that the issues presented were adequate to deserve

19   encouragement to proceed further." *Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir. 2013)

20   (internal citation omitted). "[A] claim is 'insubstantial' if 'it does not have any merit or . . . is

21   wholly without factual support.'" *Id.* (*quoting Martinez,* 566 U.S. at 16).

22         Here, Petitioner fails to show that the underlying ineffective assistance of trial counsel

23   claim is substantial. The Sixth Amendment guarantees a criminal defendant the right to effective

24

1    assistance of counsel.  *See Strickland v. Washington*, 466 U.S. 668 (1984).  "The essence of an

2    ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial

3    balance between defense and prosecution that the trial was rendered unfair and the verdict

4    rendered suspect."  *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).  Claims of ineffective

5    assistance of counsel are evaluated under the two-prong test set forth in *Strickland*.

6         Under *Strickland*, a petitioner must prove (1) that counsel's performance was deficient,

7    and (2) that the deficient performance prejudiced the defense.  *Strickland*, 466 U.S. at 687.  With

8    respect to the first prong of the *Strickland* test, a petitioner must show that counsel's performance

9    fell below an objective standard of reasonableness.  *Id.* at 687–88.  Judicial scrutiny of counsel's

10   performance must be highly deferential and there is a strong presumption that counsel's

11   performance fell within the wide range of reasonably effective assistance.  *Id.* at 689.  "A fair

12   assessment of attorney performance requires that every effort be made to eliminate the distorting

13   effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to

14   evaluate the conduct from counsel's perspective at the time."  *Campbell v. Wood*, 18 F.3d 662,

15   673 (9th Cir. 1994) (quoting *Strickland*, 466 U.S. at 689).

16        The second prong of the *Strickland* test requires a showing of actual prejudice related to

17   counsel's performance.  In order to establish prejudice, a petitioner "must show that there is a

18   reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

19   would have been different.  A reasonable probability is a probability sufficient to undermine

20   confidence in the outcome."  *Strickland*, 466 U.S. at 694.  The reviewing court need not address

21   both components of the inquiry if an insufficient showing is made on one component.  *Id.* at 697.

22        Petitioner argues that his trial counsel's performance was ineffective because he failed to

23   thoroughly investigate exculpatory evidence within his possession.  Dkt. 10 at 11.  Specifically,

24

Petitioner argues trial counsel should have discovered and investigated the victim's prior false rape allegation, and investigated and pursued the testimony of allegedly exculpatory witness, Mr. Helm. *Id.* at 12–14. These arguments fail to demonstrate that Petitioner's underlying ineffective assistance of trial counsel claim is "substantial." Even assuming these errors constituted deficient performance on trial counsel's part, Petitioner cannot demonstrate actual prejudice, i.e., a reasonable probability that but for these alleged errors, the result of his trial proceeding would have been different.

In Petitioner's motion for a new trial before the trial court, Petitioner's post-conviction counsel argued that the Court should grant Petitioner a new trial because the admission of evidence pertaining to the victim's previously fabricated rape allegation and the discovery of Mr. Helm's testimony would change the outcome of the trial. Dkt. 20-1 at 280–82. The trial court, however, found that the victim's credibility was already made an issue during trial and that the prior false rape allegation was not substantive evidence, and instead was "merely cumulative or impeaching." *Id.* at 328. The trial court also found that the "substance of those statements [by Mr. Helm] suggest[] that [Petitioner] would have been aware of the information if it was true, and could have communicated that to his attorney prior to trial." *Id.*

When Petitioner's motion for a new trial was transferred to the court of appeals as a personal restraint petition, the court held that much of the newly discovered evidence Petitioner alleged entitled him to a new trial was inadmissible hearsay, and that even if it were admissible, it was "merely cumulative or impeaching . . . ." *Id.* at 467. The court further found that while some of the evidence was admissible, it could have been discovered through the exercise of due diligence prior to trial, was not material, and was "merely impeaching evidence." *Id.* at 467–68. Thus, per the court, this newly discovered evidence did not entitle Petitioner to a new trial. *Id.*

1    Given the state courts' findings relative to the admissibility and materiality of the newly

2    discovered evidence, it is not reasonably probable that the result of Petitioner's trial would have

3    been different had his trial counsel presented the trial court with the evidence during trial.

4    Petitioner therefore fails to satisfy the first prong of the *Martinez* test.

5           Petitioner likewise fails to satisfy the second prong of the *Martinez* test because he cannot

6    demonstrate that his post-conviction counsel's representation was ineffective under *Strickland*.

7    Petitioner argues that his post-conviction counsel acted ineffectively by failing to investigate and

8    discover Petitioner's trial counsel's ineffectiveness.  Dkt. 10 at 4–7.  He contends this resulted in

9    his post-conviction counsel failing to timely raise an ineffective assistance of trial counsel claim

10   on collateral review, instead bringing this claim before the trial court in a motion for a new trial

11   over a year after the statute of limitations for doing so had passed.  *Id.* at 7.

12          Again, even assuming this constituted deficient performance on the part of Petitioner's

13   post-conviction counsel, Petitioner has failed to demonstrate post-conviction counsel's failure to

14   raise an ineffective assistance of trial counsel claim in Petitioner's post-conviction proceedings

15   prejudiced Petitioner.  Post-conviction counsel raised the same evidentiary issues underlying

16   Petitioner's ineffective assistance of trial counsel claim to the state courts, and the state courts

17   rejected them.  Petitioner has failed to demonstrate with reasonable probability that had his post-

18   conviction counsel presented the same rejected evidentiary issues to the state courts in the

19   context of an ineffective assistance of trial counsel claim, the outcome of Petitioner's post-

20   conviction proceedings would have been different.  Thus, because Petitioner has failed to

21   demonstrate that his post-conviction counsel's performance was ineffective under *Strickland*, he

22   has not satisfied the second prong of the *Martinez* test.

23

24

Petitioner has failed to satisfy the first two prongs of *Martinez*.[5]  He has therefore failed to demonstrate "cause" to excuse the procedural default of his ineffective assistance of trial counsel claim.  Because Petitioner has not met the burden of demonstrating "cause" for his procedural default, the Court need not separately address whether he has demonstrated "actual prejudice."  *See Cavanaugh v. Kincheloe*, 877 F.2d 1443, 1448 (9th Cir. 1989) (citing *Smith v. Murray*, 477 U.S. 527, 533 (1986)).  Thus, his procedural default is not excused and the Court recommends dismissal of Petitioner's second claim for relief.

> c.      *Claim 6: Inadmissible Hearsay & Confrontation Clause*

Petitioner makes no effort to show "cause" or "prejudice" for his default on his inadmissible hearsay claim or on his potential separate Confrontation Clause claim.  He has therefore failed to demonstrate that these unexhausted claims are eligible for federal habeas review, and the Court recommends dismissal of Petitioner's sixth claim for relief.

## B.      Section 2254 Merits Review

The Court now turns to the merits of Petitioner's exhausted claims, which allege that (1) the trial prosecution violated *Brady* when failing to disclose both the victim's prior false rape allegation and the existence of Mr. Helm's allegedly exculpatory testimony; and (2) the court of appeals erred when holding the newly discovered evidence was "merely cumulative or impeaching."  *See* Dkt. 10 at 16–28.

---

[5] The Court notes that Petitioner does satisfy the third and fourth prongs of *Martinez*, as he is challenging post-conviction counsel's failure to raise the ineffective assistance of trial counsel at the initial review proceeding, Dkt. 10 at 4–9, and Washington is a state where ineffective assistance of counsel, as a practical matter, must be brought during postconviction proceedings, *Woods v. Sinclair*, 764 F.3d 1109, 1137 (9th Cir. 2014).

1          1.     <u>Federal Habeas Standard, 28 U.S.C. § 2254</u>

2          Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a habeas corpus

3    petition may be granted with respect to any claim adjudicated on the merits in state court only if

4    (1) the state court's decision was contrary to, or involved an unreasonable application of, clearly

5    established federal law, as determined by the United States Supreme Court; or (2) the decision

6    was based on an unreasonable determination of the facts in light of the evidence presented.  28

7    U.S.C. § 2254(d).  In considering claims pursuant to § 2254(d), the Court is limited to the record

8    before the state court that adjudicated the claim on the merits, and the petitioner carries the

9    burden of proof.  *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011).

10          Under § 2254(d)(1)'s "contrary to" clause, a federal court may grant the habeas petition

11   only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a

12   question of law, or if the state court decides a case differently than the Supreme Court has on a

13   set of materially indistinguishable facts.  *See Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).

14   Under the "unreasonable application" clause, a federal habeas court may grant the writ only if

15   the state court identifies the correct governing legal principle from the Supreme Court's

16   decisions, but unreasonably applies that principle to the facts of the prisoner's case.  *See id.* at

17   407–09.

18          The Supreme Court has made clear that a state court's decision may be overturned only if

19   the application is "objectively unreasonable."  *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003).

20   The Supreme Court has further explained that "[a] state court's determination that a claim lacks

21   merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

22   correctness of the state court's decision."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011)

23   (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

24

1    Clearly established federal law, for purposes of AEDPA, means "the governing legal

2    principle or principles set forth by the Supreme Court at the time the state court render[ed] its

3    decision." *Lockyer*, 538 U.S. at 71–72.  This includes the Supreme Court's holdings, not its

4    dicta.  *Id.* at 71.  "If no Supreme Court precedent creates clearly established federal law relating

5    to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be

6    contrary to or an unreasonable application of clearly established federal law."  *Brewer v. Hall*,

7    378 F.3d 952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485–86 (9th Cir. 2000)).

8    Under § 2254(d)(2), a petitioner may only obtain relief by showing that the state court's

9    conclusion was based on "an unreasonable determination of the facts in light of the evidence

10   presented in the [s]tate court proceeding."  "To show such an error occurred, the petitioner must

11   establish that the state court's decision rested on a finding of fact that is '*objectively*

12   unreasonable.'"  *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012) (quoting *Lambert v.*

13   *Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004)) (emphasis in original).  "Factual findings are

14   objectively unreasonable if they are unsupported by sufficient evidence in the state court record."

15   *Tong Xiong v. Felker*, 681 F.3d 1067, 1074 (9th Cir. 2012).  In addition, the Court presumes the

16   state court's factual findings to be sound unless the petitioner rebuts "the presumption of

17   correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

18                    2.    Claims 3 & 4: Alleged Brady Violations

19   Petitioner argues the Court should grant habeas relief because the prosecution violated its

20   *Brady* obligations by failing to disclose the victim's prior recanted rape allegation and failing to

21   disclose allegedly exculpatory evidence from Mr. Helm.  Dkt. 10 at 16–25.

22   The Constitution requires that the prosecution disclose to an accused all evidence that is

23   "both favorable to the accused and 'material either to guilt or to punishment.'"  *United States v.*

24   *Bagley*, 473 U.S. 667, 674 (1985) (quoting *Brady* 373 U.S. at 87).  The duty to disclose

1  encompasses both exculpatory evidence and impeachment evidence. *Strickler v. Greene*, 527

2  U.S. 263, 280 (1999) (citing *Bagley*, 473 U.S. at 676). Evidence is material "if there is a

3  reasonable probability that, had the evidence been disclosed to the defense, the result of the

4  proceeding would have been different." *Kyles v. Whitely*, 514 U.S. 419, 433–34 (1995) (quoting

5  *Bagley*, 473 U.S. at 682). A "reasonable probability" is a probability sufficient to "undermine[]

6  confidence in the outcome of the trial." *Id.* at 434 (quoting *Bagley*, 473 U.S. at 678).

7      The state courts rejected Petitioner's *Brady* violation claims in Petitioner's first personal

8  restraint proceeding. Dkt. 20-1 at 470–75, 691. The Washington Court of Appeals explained its

9  conclusions relative to both claims as follows:

10      Eaglespeaker claims that knowledge held by others should be imputed on
the prosecutor and thus, the prosecution suppressed evidence favorable to him "by
11      failing to turn over evidence of the victim's prior recantation and statements by an
exculpatory witness in the possession of police working the case." We disagree.

12

13      Eaglespeaker identifies the parties with knowledge of J.R.'s 2011 false rape
allegation as the Beaverton, Oregon Police Department, Skamania County Sheriff's
14      Office, DSHS, and the State Attorney General's Office. Eaglespeaker argues that
knowledge held by these entities must be imputed on the prosecutor that handled
15      his rape case. But Eaglespeaker provides no authority supporting his claim that the
prosecutor can be imputed knowledge held by the Beaverton, Oregon Police
16      Department, DSHS, or the State Attorney General's Office. And Eaglespeaker
provides no evidence that the Beaverton, Oregon Police Department, DSHS, or the
17      State Attorney General's Office was working with the Skamania Prosecuting
Attorney's Office on Eaglespeaker's rape case or had contacted the Skamania
18      Prosecuting Attorney's Office prior to Eaglespeaker's trial about J.R.'s 2011 false
rape allegation in Oregon.

19      Also, Eaglespeaker provides no support for his claim that the Skamania
County Sheriff's Office (the police working Eaglespeaker's rape case) had
20      knowledge that J.R. made a false rape allegation in 2011 in Oregon. Similarly,
Eaglespeaker provides no support for imputing any knowledge DSHS or the State
21      Attorney General's Office may have had in a dependency proceeding onto the
Skamania County prosecutor prosecuting his rape case.

22

23      Eaglespeaker argues that the prosecutor "likely had constructive
knowledge" of J.R.'s 2011 false rape allegation in Oregon because "it is possible,
24      albeit unlikely, that the report from the Beaverton Police Department had been

transmitted to Skamania County." Therefore, Eaglespeaker argues, constructive knowledge of the information in the Beaverton, Oregon Police Department report should be imputed to Skamania County prosecutor prosecuting his rape case. Eaglespeaker also argues that "exculpatory and impeaching material in the hands of the Attorney General's Office or the Department of Social and Health Services should be imputed to the Skamania County Prosecuting Attorney's Office for purposes of this case."

"Though *Brady* obligations can extend to individuals beyond prosecutors and police, at some point the connection between the nondisclosure and the State becomes too remote for the underlying rationale of *Brady* to apply." Whether an individual is a state actor for purposes of *Brady* is a fact-specific inquiry.

Here, for his claim that the prosecutor had constructive knowledge of J.R.'s 2011 false rape allegation in Oregon, Eaglespeaker relies on a 2013 Beaverton, Oregon Police Department report in which an Oregon detective writes that he watched footage of a Skamania County dependency proceeding in which "an attorney" questioned J.R. about her 2011 false rape allegation. However, this report contains no information regarding who the attorney was or who the attorney represented. And though the Oregon detective describes the hearing as a dependency proceeding, the detective also refers to the hearing as a "child custody hearing." Thus, this report alone does not contain sufficient facts to determine whether the attorney referenced in the report was a State actor for purposes of *Brady*. And this report fails to show that the Beaverton, Oregon Police Department was acting on behalf of the Skamania Prosecutor's Office. Thus, Eaglespeaker fails to show that the Skamania prosecutor had constructive knowledge of J.R.'s 2011 false rape allegation based on the 2013 Beaverton, Oregon Police Department report.

Eaglespeaker attempts to suggest that J.R. delayed making the rape allegations against him because she was worried that her drug use would lead the police to call CPS. He contends that this is evidence of the "relationship between law enforcement and Child Protective Services," and the prosecution's imputed knowledge of her prior false rape allegation. But the fact that the police could call CPS does not show that the prosecution knew about her prior rape allegation or that the police or CPS was acting on the prosecutor's behalf in Eaglespeaker's rape case. The connection between the police's ability to call CPS is too remote for the underlying rationale of *Brady* to apply.

Eaglespeaker relies on evidence of emails and an exemptions list between DSHS and the Skamania County Sheriff's Office. These emails are related to incident 13-02315. The Skamania County Sheriff's Office Master Call Table shows that incident 13-02315 relates to the foster parent of J.R.'s children having marijuana in their car. But the emails do not relate to Eaglespeaker or to J.R.'s 2011 false rape allegation.

Eaglespeaker also relies on a copy of a Skamania County Prosecutor's Office child abuse report related to J.R. But this report relates to a child abuse incident that occurred on May 31, 2013, after the dependency hearing on April 10, 2013 and after Eaglespeaker's trial from May 13 to May 15, 2013.

Eaglespeaker cites to *Davila* to argue that the prosecutor here had constructive knowledge of J.R.'s 2011 false rape allegation. However, *Davila* is readily distinguishable.

In *Davila*, the State failed to disclose that a forensic scientist who had worked on the defendant's case had been fired for incompetence. The court held that this knowledge could be imputed on the prosecutor who had worked with the forensic scientist on the defendant's case because the state crime lab is an arm of the State. The *Davila* court never held that knowledge in the possession of an out of state law enforcement agency could be imputed to a prosecutor in a different state. And here, there is no evidence that the Beaverton, Oregon Police Department; the State Attorney General's Office; or DSHS were working with the Skamania County Prosecuting Attorney's Office, or working on its behalf, in investigating Eaglespeaker's rape case.

Eaglespeaker appears to argue that the Skamania County Prosecutor's Office had actual knowledge of J.R.'s 2011 false rape allegation. Eaglespeaker argues that because the prosecutor "'actually stepped into the dependency hearing'" he knew about the 2011 false rape allegation.

But Eaglespeaker fails to support his claim that the prosecutor had actual knowledge of the 2011 false rape allegation. Eaglespeaker does not show when during the proceedings the prosecutor was present or that the prosecutor was present for the entire hearing. Also, the prosecutor stated at a motion in limine hearing during Eaglespeaker's rape case that he understood the facts at the hearing involved

> a domestic violence incident where I think, [defense counsel] can correct me if I'm wrong, but my understanding is [J.R.] was basically covering for the perpetrator. She was basically feeling like she—sort of acting in a way like a stereotypical or a kind of the domestic violence dynamic that we talk about.

Additionally, the prosecutor stated that hypothetically, "It might be different if there was a prior admission to perjury where she accused someone of an incident like this and then later said that she lied about it." This shows that the prosecutor did not know about J.R.'s 2011 false rape allegation. Thus, Eaglespeaker has provided no evidence that the prosecutor had actual knowledge of J.R.'s 2011 false rape allegation.

1    There is no suppression under *Brady* if the undisclosed information was
2 available through the defendant's exercise of reasonable due diligence.
    Eaglespeaker's defense counsel was present in the courtroom during the April 2013
3 dependency hearing in which J.R. allegedly admitted to making the 2011 false rape
    allegation.  The dependency hearing occurred a month before Eaglespeaker's trial
4 began.  Thus, Eaglespeaker's counsel likely had knowledge of the potentially
    exculpatory evidence.  At the very least, had the defense exercised reasonable due
5 diligence, Eaglespeaker could have learned that J.R.'s testimony was potentially
    exculpatory evidence.

6    There is no suppression under *Brady* if the undisclosed information was
    available through the defendant's exercise of due diligence.  As discussed above,
7 through reasonable due diligence, Eaglespeaker could have learned that Helm was
    a potential defense witness because Helm had stopped by J.R.'s apartment and
8 observed Eaglespeaker and J.R. together on J.R.'s couch kissing the evening the
    rape occurred.  Furthermore, evidence of J.R. and Eaglespeaker kissing on the
9 couch does not demonstrate that Eaglespeaker did not rape J.R. later.  Thus,
    Eaglespeaker's challenge based on Helm fails.

10
11    Because Eaglespeaker fails to show that the prosecutor had any knowledge,
    imputed, constructive, or actual, of J.R.'s 2011 false rape allegation and because
12 Eaglespeaker could have discovered both evidence of the 2011 false rape allegation
    and Helm with the exercise of reasonable due diligence, Eaglespeaker fails to show
    that the prosecutor violated *Brady* by suppressing evidence favorable to him.
13 Therefore, Eaglespeaker's challenge based on *Brady* fails.

14 Dkt. 20-1 470–75 (headings, footnotes, and internal citations omitted).

15    The Washington Supreme Court adopted the court of appeals' opinion without comment.

16 Dkt. 20-1 at 691.

17    Petitioner fails to demonstrate that the state courts' resolution of his *Brady* claims is

18 contrary to, or constitutes an unreasonable application of, United States Supreme Court law, or

19 that it is based on an unreasonable determination of the facts.  Instead, Petitioner merely

20 reiterates the same *Brady* arguments he raised in his personal restraint proceeding: (1) that the

21 prosecution had, at a minimum, imputed knowledge of the victim's prior false rape allegation,

22 which it wrongfully failed to disclose to Petitioner; and (2) that Mr. Helm told the police he had

23 exculpatory evidence relevant to Petitioner's case, which the prosecutor wrongfully failed to

24

1    disclose to Petitioner. *Compare* Dkt. 10 at 16–25 *with* Dkt. 20-1 at 282–92; 490–98. But as

2    indicated, the state courts, applying *Brady* and its progeny, rejected these arguments. Petitioner

3    fails to show this was in error. Accordingly, Petitioner's third and fourth *Brady* violation claims

4    should be dismissed.

5                            3.       Claims 5: "Cumulative or Impeaching" Evidence

6            Petitioner argues the Court should grant relief because the state courts' holding that the

7    newly discovered evidence was "merely cumulative or impeaching" conflicts with federal law.

8    Dkt. 10 at 25–26. Specifically, Petitioner alleges the newly discovered evidence pertains to the

9    victim's credibility, and therefore should have been disclosed under *Brady, Giglio*, and related

10   case law. *Id.*

11           To the extent Petitioner is challenging the state courts' finding that the newly discovered

12   evidence was "cumulative or impeaching" under Washington law, this is a discretionary state

13   law determination that is not cognizable in habeas. *See Estelle*, 502 U.S. at 67–68; *Lewis*, 497

14   U.S. at 780.

15           To the extent Petitioner is alleging this evidence was more than just "cumulative or

16   impeaching" because it was material under *Brady* and *Giglio* and therefore improperly withheld,

17   the state courts found that the prosecution had no knowledge of the evidence, so could not have

18   improperly withheld it. Petitioner has failed to demonstrate that this determination was in error.

19   Thus, whether the evidence was material for the purposes of *Brady* and *Giglio* is irrelevant.

20           Petitioner's fifth claim should therefore be dismissed.

21                            **VI. CERTIFICATE OF APPEALABILITY**

22           A petitioner seeking post-conviction relief under § 2254 may appeal a district court's

23   dismissal of his federal habeas petition only after obtaining a certificate of appealability (COA)

24   from a district or circuit judge. A certificate of appealability may issue only where a petitioner

has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Under this standard, this Court concludes that Petitioner is not entitled to a certificate of appealability with respect to any of the claims asserted in his petition.

## VII. CONCLUSION

Based on the foregoing, this Court recommends that Petitioner's petition for writ of habeas corpus, Dkt. 10, be denied and this action to be dismissed with prejudice. This Court also recommends that a certificate of appealability be denied with respect to all claims asserted in this federal habeas action. A proposed Order accompanies this Report and Recommendation.

## VIII. OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **November 25, 2022**.

Dated this 2nd day of November, 2022.

S. KATE VAUGHAN
United States Magistrate Judge

REPORT AND RECOMMENDATION - 31